23-1162 Good morning. May it please the Court, my name is Matt McCullough on behalf of Appellants. Your Honors, Section 771B of the Tariff Act contemplates that certain agricultural products will satisfy the subsidy attribution conditions set forth therein, and some will not. This includes the condition that demand for the prior stage product be substantially dependent on demand for the latter stage product. This appeal challenges, as a matter of law and substantial evidence, an affirmative substantially dependent finding in the context of a table uses for raw olives, oil and table olives. In the period of examination, 92% of all raw olives were used to produce oil, 8% were used to produce table olives, the majority of table olives were made from dual use olives equally suited for oil or table applications, and no matter how you refine the prior stage product contemplated by the statute, olive oil demand dwarfs table olive demand and most table olives are still made from dual use olives that can be used for oil. The statutory term we must consider today is substantially dependent. Not the term substantial, the salient statutory criterion is the degree of dependence. In the remand decision on appeal before this Court, the Department resorted to a more than half used standard in implying this statutory language. That interpretation is contrary to law. It lacks the quantitative and qualitative basis necessary to meet the substantially dependent condition found in the statute. Is there a number? I remember the government said yes, anything over 50% is good and below 50% is not. We are not talking about picking a finite number, we are talking that the issue is whether or not this 55.8% or whatever is substantially dependent. That's correct, Your Honor. We wouldn't argue that there is any finite number that establishes substantially dependent. When you say whatever it is, you say it's less than 55? No, I'm saying, Your Honor, in the context of the table olive industry, it can't be 55%. When you look at the quantitative and qualitative context of this industry and the way it operates. What would you pick? Are we in the business of picking numbers here? Your brief uses words like all or substantially all, so what does that mean, over 90%? Your Honor, I think the simple answer to that, all or substantially all is part of the statutory test. All or substantially all can't be 55% on the face of it. Well, you say it's part of the test. The words in the statute are substantially dependent. It doesn't say all and it doesn't say substantially all, right? No, Your Honor, it says substantially dependent and that term encapsulates two important elements, a quantitative and qualitative element, all or substantially all, and single continuous line of production. And we know that because of very, very precise, well articulated, thorough legislative history, as well as a very thorough articulation of the rule that was codified by Congress, offered by the Department of Commerce in the Port Case, 1985 Port Case. But that's not typically how we do statutory interpretation. We look at the text, which is substantially dependent. We don't go back and say what were Senators thinking about at the time that they came up with substantially dependent. You're right, Your Honor, but it's more than that. So two points. One, it's not just the floor statements of the sponsors of the amendment in the Senate. We also have a conference committee report that said the intent of Congress was to codify the rule articulated by the Commerce Department, but we can look at the terms themselves. But it doesn't say every last little detail of the rule that was being applied in one or two particular cases, does it? They were going to codify the rule. They would have put the language of the ruling. In effect, they did, Your Honor, through the legislative history and through the statements and the conference committee report saying we are codifying the rule that was articulated in Port from Canada. Isn't that an awful big leap, for instance, the single continuous line of production? If they thought this test only applied to single continuous lines of production, wouldn't they have told us that in the statutory language? Your Honor, again, my position would be they do tell us that through the words substantially dependent. And maybe we can take a look at the plain meaning of substantially dependent and we can get there. Now the plain meaning of substantially dependent is largely but not wholly contingent. Now dependent or contingent, those reflect an existential condition that must be considered in the context of raw agricultural products. That's what this provision is about. So you have to ask yourself what uses are available to such products and not merely what they are used for. In some, Congress chose the word dependent, but it did more than that, an existential term. And then it magnified it by placing next to it the term substantially, substantially dependent. That term has much greater weight than the emphasis I think the U.S., the United States places on the term substantially alone. It's substantially dependent. And that term is consistent with the rule articulated by Commerce in Port from Canada and consistent with, I think, that rule. Let me ask you. The government, I think, makes the argument or makes a statement that what is substantially dependent naturally differs based on the facts and circumstances unique to a particular industry. Do you agree with that? I agree, which is why I think you have to look at that term in the context of the table olive industry and the raw olive industry in this case. And I think when you look at the record of this case... Well, does that suggest that there's a certain amount of deference owed that Commerce has to review the entire industry? And what is our review of that? What is our standard of review on that? I agree that each industry will present a different context that you have to look at in order to arrive at a substantially dependent finding. And in this case, the table olive industry has a very specific context. And that is a context in which olive oil dwarfs on a consumption basis for raw olives, table olives. Dual use olives are the majority of olives used to consume, to produce table olives. Dual use olives are equally suited to olive oil. I think in the context of substantially dependent demand, you could never say that those dual use olives are dependent on table olive demand. They would easily be absorbed by a much, much larger consumption base for olive oil. So that's a different issue than the one we've been talking about. That's not a statutory construction issue. That's kind of like, what's the sausage that goes in to coming up with that? Well, I do think it actually goes directly with the statute and the term dependence. I think it's directly linked to that. You have to assess dependence and not merely use of the raw agro- Fair enough. I think we've been focusing more on the numerical substantially, most if not all. Okay. But I do think these concepts that are encapsulated in substantially dependent, for example, single continuous line of production, that is the discipline embedded in the statute to ensure you have a reasonable latter stage product. And it also is a qualitative assessment of dependence, where you have a situation where a raw agricultural product has little or no other use. And that is the very essence of dependence. And that is the statutory term we're really focused on, is dependence. If we didn't have any dual use varietals, in this case, olive blanca and cassavina, and the smaller uses, this case would certainly be a lot simpler. But I would think then that you would have separate lines of production. Would you not, even though there's a little bit of bleed over from the mill olives, olives cultivated from mill versus olives cultivated from table. There's a little move in one direction. They're looking at 2016. I know the later years have changed. Would that satisfy, in your view, the test for a single line of production? Let me see if I understand your question correctly. First of all, this is really a hypothetical. I understand. I'm focusing on the table olive component of those two lines of production. Is that discreet enough to be a single line of production going from the non-dual use table olives, cultivated from table, usable for the most part, only in table, all the way to the table? I don't believe so because, Your Honor, in that situation, I think you are in essence gerrymandering the prior stage product because what you're doing, are you assuming that there's no existence of dual use olives? Are you trying to, okay, I think that would be a very different fact pattern, a very different context. What I'm trying to get at is when you're talking about a single line of production, are you saying there can't really be any bleed over from one to the other? And taking table olives as a separate issue. I think the rule that was articulated by Commerce and that was codified contemplates that there should be little or no other bleed over. That's correct. One question about, you've got various substantial evidence disputes, but particularly about the carcerinia olives that are excluded by Commerce. Have you shown any harm to you from that alleged error? I think that error, the significance of that error, Your Honor, is in the denominator of the department's dependence ratio because what they've done is taken a dual use olive, carcerinia. They have excluded that portion of it that was grown for oil but used for table. They assume that none of that carcerinia volume was grown for table to begin with and therefore, although we know from the record that there was 41,000 tons. But does it go, did they exclude it from the numerator and the denominator? They, by leaving some carcerinia in the numerator because they didn't completely exclude it, they should have included carcerinia, including that component used to make oil, much like Goiblanca, in the denominator. So you do say you were harmed because what it made the overall 55% higher than it should have been. Correct. That's correct. Where do you find the inclusion of carcerinia in part in the numerator? In the numerator, Your Honor? Because I know the understanding that what Commerce did was to leave out carcerinia altogether since they didn't have the data. Now that, including carcerinia, if you include it based on the assumption that the percentages, the proportionality of carcerinia between table and mill is the same as Goiblanca, for example, then that affects the ultimate numbers a little bit, a couple of percent, but not fundamentally. Where do you get that carcerinia was included in the numerator? So you have to start with the base of the numerator and what the Commerce Department assumed at the very beginning from the base of the numerator using their category-based data is that carcerinia is not there. They said this is the number for the other variables, excluding carcerinia. Right. You left carcerinia out. Well, they assumed it wasn't there, but if you look at, this is Appendix 11643, which is the ICA data, which is relied upon by the Department on the periphery, which now is to do some of its computations. If you look there, this is what the Commerce Department claims are olives grown for table. And you will see that carcerinia grown for table is 45,000 tons. So there are 45,000 tons in their base numerator that they simply assumed did not include those 45,000 tons. The exclusion that they affected was to take the carcerinia grown for oil, but was used for table based on a ratio analysis. So there is carcerinia in the numerator, but they didn't do anything with the denominator as they did with Oeblanca. And because these are dual use olives, and because the oil market is so massive compared to table, and if you look at the experience of Oeblanca, the volume of Oeblanca used for oil almost approaches the total volume of raw olives used to produce table olives. And so the assumption that carcerinia wouldn't have a significant impact on the denominator, I think is invalid. It's a dual use olive. You would expect it to have a large oil component that would be in there much like Oeblanca. Is it reasonable to assume that the breakdown between oil and table ultimate use in carcerinia is roughly the same as with Oeblanca? I think that is as reasonable, Your Honor, as the Department's ratio analysis to assume to break down the different varietals that are in that volume of oil used for table that they didn't perform the exclusion on. Is that a yes or a no? I think it's reasonable to assume yes, because they are dual use olives. All right. Let's hear from the other side, and then we'll start some double time. I'm sorry, Your Honor? Let's hear from the other side. Oh, yes. I see my time is up. Ms. Hogan, you're taking 11 minutes, and your colleague is taking four. Yes, Your Honor. Could you just straighten me out from the perspective of the last issue, whether carcerinia was, in fact, included in Commerce's numerator? It is not, Your Honor. It is neither included in the numerator or the denominator. That's explained at page 58 of the appendix, which is Commerce's second remand redetermination. And you can also see that from the actual calculation, which is found on page 11895. I apologize. The font is a little small, but if you look at the— I'm not small. My eyesight went to 2449. But if you look at step five, where Commerce actually does the ratio calculation, the denominator, which is the 1,024,026 tons that comprises the manzanilla, cordial, carcerinia, and hoidlanca varietals, is just simply not the case. I mean, that was the whole entire point of removing it from the denominator. What about the 45,000 tons of it listed in the ICA data? What happens to that? That is explained—I apologize, Your Honor. Commerce does explain that calculation at page 280, I believe? 230. Sorry. 230. I'm sorry. That's the wrong determination, Your Honor. I'm sorry. I don't want to take up too much of your time. I'll find a page number. Thank you. That's fine. If you find a page number later, you can just give it to us. Yes, will do, Your Honor. I would like to return, first of all, may it please the Court, and I would like to return to the statutory interpretation question. We fundamentally disagree that Congress had any sort of specific quantitative threshold in mind when it enacted the statute that is not reflected in the language that Congress used in the legislative history or, indeed, even in the prior administrative determinations. And we would, I think, respectfully disagree somewhat with the trial court to the extent that the trial court seemed to infer that there had to be some sort of 50% threshold. We don't think that there is one. Commerce has never stated that that is its practice. So what do we do with that? If it's a question of interpretation, is that interpretation on a case-by-case basis? Yes, Your Honor, and I think that that is the case for two reasons. Is that a step one Chevron question then? I think it's fundamentally a step two determination because the term substantial, substantially dependent necessarily has both a quantitative and a qualitative aspect to it. And it's a broad term, right? Substantially could mean more than a scintilla. It could also mean, as here, something that on the facts of this record was more than 50%. If the Supreme Court should, for example, decide that Chevron is no longer good law, what happens to your Chevron step two? Well, we hope that Eurodief is still good law after that. You mean specifically with respect to commerce issues? Exactly, Your Honor. Assuming you don't have Chevron at all, what is your position as to what this statute means? We believe that the statute requires some— I mean, we agree that the statute requires commerce to evaluate the degree to which demand for the prior stage product is dependent on the latter stage project in consideration of the structure and the makeup of the particular agricultural market. Substantially dependent I think certainly means something more than de minimis, but it does not necessarily have a 50% or any specific threshold. So in public— I mean, you say in your brief it naturally differs based on the facts and circumstances unique to a particular industry, given. But beyond that, you have no range? What I can point the court to is the Commerce's 2013 administrative determination from Shrimp from China, where Commerce explained that on the facts of that case, even a 25% ratio would constitute substantial dependence, because if 25% of the market for the latter stage product were to evaporate, that would essentially lead to a collapse of the demand for the prior stage product. So I think if the court is looking for some specific number, that's a number that Commerce has pointed to as would be a minimum that would meet the statutory definition. Doctrinally, one of the ways that the Supreme Court has identified the manner in which Congress can act with respect to agencies is to say that— the overall Chagall analysis is to say that Congress can give explicitly or even implicitly give an agency the authority to make determinations as to the application of the statute in particular cases, separate from the general Chagall II argument that, well, agencies have an inherent power to do this, but rather saying that when Congress says— the head of the VA can issue regulations to define what survival means, that then there's a clear allocation, delegation of authority. Do you think this case falls within that category, even though there's no express delegation to the Secretary of Commerce? Yes. And as this Court has said many times, that Commerce is considered the master of the anti-dumping law. In the same regard, it's the master of the countervailing duty law. So I think that that has been a very well-established understanding that Congress does not always identify the specific fact patterns or the specific methodological tests that Commerce has to use. It necessarily has to delegate to the Secretary of Commerce to do whatever— But that sounds more like a conventional Chagall Statute analysis rather than a delegation analysis. I'm looking to see if there's anything in the legislative history or anywhere else that can give us a way of saying this is more of a delegation case than it is a preference case. You see what I'm saying? I do understand the distinction that the Court is drawing, and I don't have a specific citation to a statute with regard to overall delegation to the Secretary in matters of countervailing duty law, although I feel confident that there is one. I just don't have it. Are we talking about necessarily overall delegation, which means we get no review? No. I agree with Jay Preston. The word substantially invites somebody having to do something, and presumably that person would be someone with expertise. But then we can play around with whether or not we get to decide the essence of what substantially means. So you make your case about why this is substantial, and we review it, perhaps deferentially, but applying the word substantial, right? We absolutely agree. If the Court finds that the determination here, based upon the facts of this record, does not comport with a substantially dependent language, it's an unreasonable application. So on that point, just moving on to your friend's other major argument about the market here. Do you have anything to say about that? Well, I think we disagree with a few of the characterizations of that market. What Commerce found was, I think particularly with respect to the dual-use olives, is that, yes, it is absolutely true that they can be used either for mill or table. But the factor means that at the beginning there's different size, quality, blemish requirements for both table and for oil. And as a matter of practice, farmers know at the beginning of the growing season where the destination of those olives are likely to be because there's different insurance premiums, there's different cultivation practices, there's different irrigation practices. And we also agree that there is some degree of fungibility or fluidity, perhaps. Well, the joker in the deck is the dual-use, right? That would be Blancana, Caserini, and the minor players. And they are not dedicated to one or the other at the outset, as I understand. No, they are, Your Honor. I think that's what we're saying, is that from a practical perspective, because there are different irrigation practices... Oh, I see. I know what you're saying. So a given dual-use olive may be cultivated on dry setting with less tending, less pruning, and so forth. Yes, right. So I think that's a reasonable... Even though those olives may end up in the mill. They may end up in the mill because they don't meet the quality standards, for example. So you're not defending the CIT's interpretation. What exactly would be the statutory interpretation you would have us adopt? Well, I guess to go back to the point of, I don't know that the court has to adopt it. I think it has to adopt a particular holding about what that language specifically means, because I don't think that there is a plain language answer to it. What the court can do is find that in this circumstance, on this record, a 55% consumption ratio does meet the statutory definition of substantially dependent, which is something that requires some degree of dependence. If we were to actually use the case to construe the statute, you would have us strike the most or mostly or greater than 50% from what the trade court said. I think that's fair. There were other dictionary definitions that the trial court identified, such as words like essential, material, that the court did not adopt for whatever reason.  Thank you. May it please the court, Raymond Paretsky, the U.S. ripe olive industry appreciates the opportunity to appear today. Appellant's faulty interpretation of Section 771B would leave numerous agricultural industries without recourse from unfair foreign subsidies, contrary to the intent of Congress. Building on what the counsel for the government said, I note that Black defines substantial as important, essential, and material, and considerable in amount or value. Nothing in this definition requires a strict 50% minimum standard. Would 8% be enough? Because at one point Congress thought it was. I think not, but on its first remand, Commerce moved on from that to 8% and came up with a different definition. If we did as you want us to do here, what's to prevent Commerce from going back to 8%? I think that what is substantial is going to vary based on the context in the case. We know about raspberries, for instance, which the congressional drafters referenced. Raspberries have a lot of downstream products, and it's possible that frozen raspberries are 12% and puree is 8%, but there's two other products, jam and fresh, because fresh raspberries are edible, delicious, not like olives. They could be 40 each. I think in that context both of them are substantial. It may be that fresh is 50% and there isn't a single processed product. All the processed products together don't equal 50, and yet perhaps the two that are the most significant would qualify as substantially dependent. It depends what's the driver for the demand. Is the right interpretation one that allows for something as low as maybe single digits to potentially be proven to be substantially dependent? It's hard for me. I wouldn't set a standard, but it's hard for me to imagine a case where single digits is sufficient in context, but I could certainly imagine cases where there's two, even three processed products that are potentially all significant. I don't think we can rule that out. When you conclude, as you just did, that single digits probably wouldn't cut it, what's going through your mind analytically as to why you think single digits won't cut it? It has to be substantially dependent, right? So there has to be some element that the demand is being driven by the demand for the latter product. In this case, I would argue that because table and returning to your dual-use table olives, when dual-use olives are grown, it's the table olives that are the driver, right? If you put in the money to grow dual-use olives for table intention, right? You're spending a lot of money on pruning. You're on the good land. You're really going out of your way to do it. What goes to mill from that is going to be a disappointment. That's right. So there's no question that you have substantial demand, whatever the figure happens to be in a particular year. And here I think the figure is diluted because after the first remand from the court forced commerce to redefine the prior stage product, it included the dual-use olives that are grown for mill, right? But nobody, those dual-use olives are grown for mill, aren't getting the benefit of that extra money, they're not in the right land and everything like that. So they're never going to make, you know, just one or two percent of them in any given year are good enough to go to table. It's clear that the higher profit product, the table olives, is what is driving the demand. So I think that, you know, while we can argue about what the percentage should be, I don't think there is a minimum. It's context. I see the amount of time. I think that in this case it's very clear that there's substantial demand. So you would be happier if the second time around, I guess it was, had been the prevailing view in that olives grown for mill should have been excluded altogether. I think so. Okay. And I think we do. Okay. Thank you very much. We'll just do our two minutes of rebuttal. Very quickly, Your Honors, let me address the substantial evidence arguments because I think they'll illuminate both the statutory issue and some of the evidentiary errors. And I'll reduce it to 70,000 tons of dual-use olives. And context is important here. The department had to concede that dual-use olives are equally suited for table applications or oil applications. And the record showed that dual-use olives are more than half of the total volume consumed to produce table olives. Now the department attempted to address this through the numerator of its dependence analysis by including only those olives that it found must be used to produce table olives, either because of biological distinction or in the framework they created for dual-use olives because of cultivation practices. I would argue that something that is less economically viable is not equivalent to dependence. But in any event, it was in effect the department's own quantification of dependence volume. Yet even after committing to this very specific depiction of the market and despite various data and computational machinations that we covered in our brief, the department's analysis still showed 70,000 tons of dual-use olives that were grown for oil, yet used for table that the department could not explain. These olives were not subject to the dependence constraints that the department identified with respect to dual-use olives grown for table. What year are you referencing there? 2016. This is their data. It was true. The problem here is the only way they satisfied their standard was to add this 70,000 tons of non-contingent dual-use olives to their numerator. It was the only way. Yet that was totally inconsistent with the framework they created. And it was totally inconsistent with the statute. And I want to return to the statute. It's about dependence. And the second you start putting tons of olives into the numerator that were simply used but not dependent on table olive demand, you're only measuring use. And that's a critical point. And that takes it back to the statute that you cannot ignore because that part of it, whether you think that there are terms not in the statute or in the statute, dependence is there and it has to be interpreted by its plain meaning. And it is not the equivalent of use. One last point I want to make about Kasserania. Appendix 11241. This is their data. It's category-based data. You don't know what varietals are in there in this data. They assume that their base of 492,244 tons in year 2016 does not include Kasserania. That's their base. They start from there and they say it's not there, but that's going to be in the numerator. We know from the other data that they relied upon, in part, that there was at least 41,000 tons of Kasserania that were grown for table. And under their analysis, if it was grown for table, then it must be used for table. So it is in the numerator of their analysis and was never excluded. Yes. Okay, thank you. Ms. Hogan, you were going to give us a cite. Did you find that? No. My citation is actually to my colleague's brief at page 25. There's a fairly substantial analysis with the citations to the record. Okay, thank you very much.